In The


Court of Appeals


Ninth District of Texas at Beaumont





NO. 09-04-209 CR







ROBERT WAYNE MCCULLOCH, Appellant



V. 



THE STATE OF TEXAS, Appellee







On Appeal from the 284th District Court


Montgomery County, Texas


Trial Cause No. 04-01-00071-CV






MEMORANDUM OPINION



 A jury convicted Robert Wayne McCulloch of aggravated sexual assault of his
step-daughter ("T.R."), and assessed his punishment at ten years' confinement in the Texas
Department of Criminal Justice--Institutional Division. Upon the jury's recommendation,
the trial judge suspended the imposition of the sentence and placed McCulloch under
community supervision for ten years. McCulloch appealed from that conviction and the
judgment of the trial court was affirmed. See McCulloch v. State, 39 S.W.3d 678 (Tex. App.--Beaumont 2001, pet. ref'd).

 McCulloch challenged his conviction in an application for a writ of habeas corpus. 
See Tex. Code Crim. Proc. Ann. art. 11.08 (Vernon 1997). As grounds for relief,
McCulloch raised the issue of ineffective assistance of counsel. The trial court denied relief
and from that order McCulloch brings this appeal. McCulloch alleges trial counsel's
representation was deficient in six regards. We will address each in turn. (1)

 The proper standard for determining claims of ineffective assistance under the Sixth
Amendment is that adopted by the United States Supreme Court in Strickland v. Washington,
466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Hernandez v. State, 726 S.W.2d
53 (Tex. Crim. App.1986). The Supreme Court in Strickland adopted a two-pronged analysis
requiring the defendant to show (1) counsel's performance was deficient, and (2) counsel's
deficient performance prejudiced the defense. Strickland, 466 U.S. at 687. We look at the
totality of the representation and the particular circumstances of the case when evaluating a
claim of ineffective assistance. See Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App.
1999). Any allegation of ineffectiveness must be firmly founded in the record, and the record
must affirmatively demonstrate the alleged misconduct. Id. at 814. In reviewing a claim of
ineffective assistance, we "must indulge a strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance; that is, the defendant must
overcome the presumption that, under the circumstances, the challenged action 'might be
considered sound trial strategy.'" See Jackson v. State, 877 S.W.2d 768, 770-71 (Tex. Crim.
App.1994) (quoting Strickland, 466 U.S. at 689. 

 First, McCulloch claims trial counsel failed to present evidence of a possible motive
for T.R. to falsely accuse him. That motive, according to McCulloch, is retaliation for him
filing complaints with the Texas State Board of Pharmacy and the Montgomery County
District Attorney's Office in 1993, reporting T.R.'s stepfather, Charles Cates, for unlawfully
dispensing drugs to McCulloch's son, D.M. The Board suspended Cates' license for two
years, probated for all but fifteen days, and fined him $1,750. The indictment was dismissed
pursuant to McCulloch's request on December 12, 1995. 

 T.R.'s outcry was made in May of 1998. In his affidavit, trial counsel stated, "I did
not introduce evidence of applicant's complainants [sic] against Cates because the indictment
was dismissed about two and one-half years before the outcry, thereby attenuating the
evidence of a possible motive for [T.R.] to make a false accusation." The trial court found
trial counsel "presents a plausible basis for not presenting evidence of Applicant's complaints
against Charles Cates." McCulloch points out the State argued in closing there was "no
motivation for lying" and contends if the jury had known Cates was professionally
disciplined and indicted as a result of his complaints, it could have concluded T.R. falsely
accused him in retaliation. 

 T.R.'s affidavit provides, "I do not hate Mr. McCulloch for filing a complaint against
Mr. Cates . . .." T.R.'s outcry was made five years after McCulloch reported Cates, and more
than two years after the indictment was dismissed. There is no evidence of any animus on
the part of T.R. and no explanation as to why she would delay so long in retaliating. 

 Trial counsel's reason for choosing not to present the evidence of McCulloch
reporting Cates is the lapse between that action and T.R.'s outcry, suggestive of a belief the
jury would not think T.R. waited five years to retaliate in such a manner. McCulloch has not
demonstrated trial counsel lacked legitimate and professionally sound reasons for his actions. 
See Bone v. State, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). 

 Second, McCulloch contends trial counsel failed to present evidence T.R. had
pinworms when she was almost five years old. There was testimony at trial that T.R.'s
stepmother, Linda Red, noticed blood in T.R.'s panties on one occasion when she was five. 
Dr. Bruce Halbridge, a gynecologist, testified for the defense a five-year-old girl could have
blood in her panties from either estrogen or an injury. There was no evidence presented that
T.R. had an illness or injury at that age which could account for the blood. McCulloch
argues that as a result the jury could have concluded Red's testimony corroborated T.R.'s
claims to an extent. 

 A private investigator hired by McCulloch after the trial found medical records of an
emergency room visit two months before T.R.'s fifth birthday. The records reflected T.R.
had pinworms in her rectum and pinworm eggs in her vagina. Dr. Mark Jacobs, an
obstetrician and gynecologist, provided an affidavit to the effect that pinworms cause itching
and had T.R. scratched because of it, she could have bled in her panties. Dr. Jacobs further
opined that when hospital personnel examined T.R., they would have observed her external
genitalia, and they did not note any hymenal tears, which, had they existed, would have been
visible. Dr. Jacobs then infers from the failure to note any hymenal tears that there were not
any, refuting T.R.'s testimony that McCulloch penetrated her vagina with his finger once per
month during the previous two years. 

 Toni Cates, T.R.'s mother, stated in her affidavit that when T.R. had pinworms, Toni
did not see her scratch herself until she bled. Linda Red's affidavit provides that she is
unable to pinpoint the date when she found blood in T.R.'s panties, but she was around five
years old. Red averred the blood would have been directly under the vagina. She carefully
watched T.R. over the next few days, looking for an explanation for the blood, but T.R. was
not in any pain or discomfort, was not scratching herself in her parts, and Red did not see any
more blood on her panties. 

 Dr. Linda Cecil, an obstetrician/gynecologist, examined T.R. in 1998 and found her
hymen was torn in several places, and had been well-healed for some time. Dr. Cecil
testified the scarring was consistent with penetration "at any time" before the two or three
weeks immediately preceding the examination. On cross-examination, Dr. Cecil testified that
T.R. could not remember that McCulloch ever put anything in her vagina, but remembered
bleeding after one of the incidents. 

 Trial counsel's affidavit states he believed he had all of T.R.'s childhood medical
records. He did not request discovery of the names of all medical personnel who had treated
T.R. prior to her outcry, nor did he discover those records through independent investigation. 
Trial counsel averred that if he had, he would have introduced the records into evidence and
presented expert testimony that the pinworms could account for the blood in her panties and
that hospital personnel did not note any hymenal tears, and argued that refuted T.R.'s
testimony that her vagina was penetrated on a monthly basis when she was three to five years
old. 

 McCulloch argues trial counsel should have thoroughly investigated T.R.'s medical
history and discovered she had been treated for pinworms. At that point in time, T.R. was
living with her mother and McCulloch. McCulloch's affidavit does not reveal why he did
not tell trial counsel of the incident. Furthermore, the record reflects trial counsel did obtain
T.R.'s medical, school, and counseling records. The trial court found trial counsel "diligently
sought and obtained what he believed were all of [T.R.'s] childhood medical records, and no
deficient performance is shown." We agree; the record does not divulge how the
independent investigator obtained the medical records or the degree of difficulty in doing so. 
Moreover, it has not been demonstrated that trial counsel's failure prejudiced the defense. 
While the pinworms would have provided an alternate theory for the blood in T.R.'s panties,
that evidence would have been disputed by that set forth above from the affidavits of Toni
Cates and Linda Red along with the testimony of Dr. Cecil that T.R. remembered bleeding
after one occasion. Accordingly, we do not find, by a preponderance of the evidence, that
trial counsel's omission "so undermined the proper functioning of the adversarial process that
the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

 Third, McCulloch complains that trial counsel failed to cross-examine Toni Cates
about possible motives for a false accusation and the absence of any physical evidence of
sexual activity. According to Dr. Jacobs in his affidavit, if the events recounted by T.R.
happened as frequently as she claimed, "there likely would be physical evidence of sexual
activity, such as semen, blood, or pubic hair, on her blanket, sheets, or clothing. If her
mother did not observe any physical evidence of sexual activity in her bedroom during this
period of time, the child's credibility would be in doubt." In his affidavit, trial counsel states
he did not elicit testimony from Toni that she did not observe any physical evidence of sexual
activity and that he had no strategic reason for the omission. Toni Cates did testify, on direct
and on cross, that she had no idea what was occurring at the time. From that, the jury could
reasonably infer she saw no physical evidence suggesting sexual activity.

 McCulloch further complains that trial counsel failed to question Toni about a matter
arising from their divorce. Jerald Crow, McCulloch's attorney in that case, stated in his
affidavit that Toni's lawyer informed him that Toni believed McCulloch had molested her
daughter and she would go to the authorities if McCulloch did not make concessions in the
divorce settlement. Trial counsel's affidavit provides that he did not ask Toni whether she
made the threat because he did not want to open the door to other issues pertaining to the
divorce and could not prove T.R.'s allegations were related to the divorce. We have
reviewed Toni's affidavit and find the allegations regarding McCulloch's sexual proclivities
and acts of assault, both physical and sexual, are of such a nature that counsel's strategy to
keep that evidence out was sound. Although that evidence may have shown Toni knew, or
at least suspected, the abuse was occurring, it would not have established that T.R. was lying
about it nine years later. Moreover, the details of Toni's allegations would almost certainly
have prejudiced the jury against McCulloch. Consequently, we cannot say trial counsel's
conduct fell outside the range of reasonable professional assistance.

 McCulloch also notes that trial counsel did not elicit testimony regarding his
complaints against Charles Cates. He asserts this would have enabled the jury to understand
Toni's animus towards him. Had trial counsel questioned Toni regarding any personal
animosity toward McCulloch on behalf of Charles, evidence of other grounds for Toni's
feelings might have been admitted, particularly the physical and sexual abuse. As noted
above, we find it was sound trial strategy to avoid opening that door.

 Fourth, McCulloch charges that trial counsel failed to elicit testimony that the scarring
in T.R.'s vagina did not establish penetration. In his affidavit, trial counsel states that he did
not dispute T.R.'s vagina had been penetrated prior to the pelvic examination but focused on
establishing that Dr. Cecil's finding did not support T.R.'s account of events. To that end,
trial counsel presented evidence that the scarring could have occurred anytime in the last ten
years and that the scarring was not consistent with the acts, and frequency of those acts,
described by T.R. 

 As noted above, Dr. Cecil testified the scarring was consistent with penetration any
time before the two or three weeks immediately preceding the examination. On re-cross-examination, trial counsel questioned Dr. Cecil as to whether the penetration that caused the
scarring could have happened two weeks before the examination. Dr. Cecil agreed and
indicated there was no time interval she could give for when it occurred. 

 Dr. Bruce Leonard Halbridge, an obstetrician/gynecologist, testified for the defense. 
Dr. Halbridge testified he reviewed Dr. Cecil's records and the evidence was not consistent
with regular penetration of her vagina from age three to five, nor was it consistent with a
penis in the vagina, on more than occasion, of a child age seven to eight years of age. Dr.
Halbridge admitted he was referring to penetration in the medical, rather than legal context.

 Dr. Jacobs stated in his affidavit that the scarring described by Dr. Cecil "is
completely non-specific and did not establish penetration." Dr. Jacobs also notes that Dr.
Cecil did not observe a deep posterior cleft in T.R.'s hymen, which is more indicative of
sexual abuse during childhood, and opines that trial counsel should have questioned Dr. Cecil
about its absence. In his opinion, Dr. Jacobs declares, "Dr. Cecil did not conclude that
penetration occurred, but she was not asked and did not clearly express that conclusion in her
testimony." Dr. Jacobs' affidavit does not reflect whether he is using "penetration"
according to the medical or legal definition.

 It is important to note that evidence of any penetration, no matter how slight, satisfies
the State's burden of proof. See Sherbert v. State, 531 S.W.2d 636, 637 (Tex. Crim. App.
1976) ("Penetration between the labia of the female's private parts . . . is sufficient although
the vagina was not entered . . ."). The expert testimony regarding scarring relates to
penetration that was at least invasive enough to breach the hymen. That, however, is not the
burden of proof borne by the State. Even if trial counsel elicited express testimony from Dr.
Cecil that the scarring in T.R.'s vagina did not establish penetration, there would still have
been evidence of penetration by McCulloch sufficient to sustain the jury's verdict. 
Furthermore, trial counsel did elicit testimony that called into question T.R.'s version of
events. The jury's rejection of that evidence does not necessarily mean trial counsel was
deficient. We find McCulloch has not overcome the strong presumption counsel's conduct
falls within the wide range of reasonable professional assistance. See Jackson, 877 S.W.2d
at 771.

 Fifth, McCulloch contends trial counsel failed to object to the State's misstatement
during summation that the presence of old scar tissue in T.R.'s vagina proved penetration had
occurred. The State argued in closing, ". . . in your common experience, with your
knowledge of intimacy between a man and a woman, and taking into account what Dr. Cecil
said and what the other doctor said, clearly old scar tissue shows the child had been
penetrated." According to his affidavit, trial counsel did not object because he did not realize
the State had misstated Dr. Cecil's testimony. We cannot say trial counsel's failure to object
was in error as it appears the State was asking the jury to make a reasonable deduction from
their experience and knowledge, as well as the testimony of Dr. Cecil, that the scar tissue was
consistent with penetration. See Clark v. State, 952 S.W.2d 882, 889-90 (Tex. App.--Beaumont 1997, no pet.)(citing Alejandro v. State, 493 S.W.2d 230, 231-32 (Tex. Crim. App.
1973)). As the argument is not a misstatement of Dr. Cecil's testimony, we find counsel's
performance was not deficient.

 Sixth and finally, McCulloch complains trial counsel failed to move for a mistrial after
the court sustained an objection to the State's argument that, in his personal opinion,
McCulloch was guilty. The trial court instructed the jury to disregard the State's personal
opinion. Trial counsel did not move for a mistrial and in his affidavit concedes it was not a
strategic decision. An instruction to disregard is sufficient to cure such an error, accordingly,
no prejudice is shown. See Walters v. State, 777 S.W.2d 734, 737 (Tex. App.--Beaumont
1989, pet. ref'd) (citing DeBolt v. State, 604 S.W.2d 164, 169-70 (Tex. Crim. App.1980)).

 Under Strickland, an applicant arguing and contending ineffective assistance of
counsel must show not only that trial counsel was not functioning and performing as
guaranteed by the Sixth Amendment to the United States Constitution (which requires
reasonably effective assistance), but must also demonstrate trial counsel's errors were so
serious and grievous as to have deprived him of a fair trial. See Benoit v. State, 704 S.W.2d
957, 959 (Tex. App.--Beaumont 1986, no pet.). The applicant must also set forth and
illustrate that, but for counsel's unprofessional errors, the result of the trial would probably
have been different. Id. Indeed, the applicant must make it fairly clear to the appellate court
that a reasonable probability exists the result would have been different but for trial counsel's
ineffective assistance. Id. 

 For all of the above reasons, we find McCulloch received effective assistance of
counsel. McCulloch's sole ground of error is overruled. The order of the trial court denying
the writ of habeas corpus is affirmed. 

 AFFIRMED. 

 PER CURIAM


Submitted September 2, 2004

Opinion Delivered October 27, 2004

Do not Publish


Before McKeithen, C.J., Burgess and Gaultney, JJ.
1. We do so under a de novo standard of review. See Ex parte Peralta, 87 S.W.3d
642, 645 (Tex. App.-San Antonio 2002, no pet.)(and cases cited therein).